IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

David Ponder,

        Plaintiff,

v.

Myron Freeman, Ronald Applin,
Deputy Redden, Robert Price,
Steve Borders, Marilyn Levo,
Iyanhous Weaver,

        Defendants.

CIVIL ACTION NO.

1:09-cv-03423-JEC

## <u>ORDER & OPINION</u>

This case is before the Court on defendants' Motion for Summary Judgment [39] and plaintiff's Motion for Partial Summary Judgment [38]. The Court has reviewed the record and the arguments of the parties and, for the reasons that follow, concludes that defendants' Motion for Summary Judgment [39] should be **GRANTED in part** and **DENIED in part** and plaintiff's Motion for Partial Summary Judgment [38] should be **DENIED**.

AO 72A
(Rev.8/82)

**BACKGROUND**

**I.    SUMMARY OF FACTS AND CONTENTIONS**

This is a § 1983 action arising from the execution of an arrest warrant at plaintiff's home.  The abbreviated version of the facts is as follows.  On November 27, 2007, Fulton County Sheriff's officers attempted to execute an arrest warrant for a Demone Heyward at an address in Atlanta: 2147 Beecher Road.  This address is a home that, from the street, appears to be a single-family residence.  It has one mailbox and one front door.  In fact, however, on the interior the house has been subdivided into three units: a Unit A (upstairs), a Unit A (downstairs/basement), and a Unit B.  As it turns out, there are multiple doors into the home, on the side and back of the house.

At the time of the execution of the warrant, at least one tenant was living in each of these three units.  The officer who was executing the arrest warrant, Sergeant[1] Iyanhous Weaver, was not aware that the home had been sub-divided, at least when he first began his efforts to execute the arrest warrant.

The subject of the arrest warrant, Heyward, was the tenant in Unit B, and he was eventually found hiding in the basement of Unit B

---

[1]  In the record that the Court has reviewed, Mr. Weaver has been referred to as a sergeant and a deputy.  The Court will attribute the higher rank to him throughout this Order.  Whatever it may be, Weaver's rank has not been dispositive as to any conclusions that the undersigned has made.

AO 72A
(Rev.8/82)

in a dryer by other officers who had arrived on the scene.  These officers arrested Heyward.  Before that happened, however, Sergeant Weaver had entered the upstairs Unit A area where the plaintiff, David Ponder, lived.  Although there are few details in the record about the search, itself, of upper Unit A, one can reasonably assume that Weaver, and perhaps other officers, searched this unit for their suspect, as that was their purpose in entering the unit.  Indeed, defendants do not deny that a search occurred for Heyward in the upstairs part of Unit A.

Plaintiff Ponder also offered few specifics about the search of his unit, albeit he was perhaps not in the best vantage point to see everything that transpired that evening, as very shortly after Sergeant Weaver approached him, plaintiff was handcuffed by the deputy and made to stay in a sunroom in the back of his part of the house.  Plaintiff remained that way for the 45 minutes to an hour before the officers arrested him and left the scene.

Plaintiff has sued, based on what he claims is "the illegal search and seizure of [his] person and home," in violation of the Fourth Amendment and the Fourteenth Amendment.  (Compl. [2] at ¶ 1.) He has sued five Fulton County Sheriff's officers (Weaver, Redden, Price, Borders, and Levo) for the search and seizure at his unit.  He has sued two retired supervisory officers--former Sheriff Myron Freeman and former Captain Ronald Applin--for what plaintiff claims

3

were inadequate procedures to safeguard against officers searching the wrong unit in a multi-unit property.

As to the above five officers, defendants argue that there is no evidence that these four officers[2] ever entered plaintiff's unit. As to the fifth officer, Sergeant Weaver, it is clear that he entered the unit, but this defendant contends that he is entitled to qualified immunity as he had the consent of the tenant in the basement section of Unit A to enter the unit.

Albeit the handcuffing of plaintiff for almost an hour would seem to be the most dramatic event of the evening and albeit a consent to search by a co-tenant would presumably not authorize officers to handcuff a non-consenting tenant, plaintiff has not discussed the significance of this handcuffing in terms of his claims, as the briefing of both sides focuses only on the entry and search aspect of the claim. Nevertheless, as plaintiff does assert in his complaint an unlawful seizure of his person, the handcuffing would appear to be the means by which the officer effected plaintiff's seizure.

As the above discussion hints, the facts in this case are fairly clear as to the broad points--plaintiff's unit was entered without

---

[2] Defendants acknowledge that Deputy Levo briefly entered the unit to inform Weaver that other officers had found the suspect Demone Heyward.

4

his consent and searched, and he was handcuffed for a period of time in that unit--but very murky as to the details of which part of the house a particular officer entered, and in what sequence.  The confusion arises, in part, because officers--and even plaintiff, on occasion--note memory lapses as a result of the long delay between the search and seizure, which occurred in November 2007, and the depositions of the officers in October 2010.[3]  Much of the confusion arises, however, because the officer deponents were not shown a diagram of the house at 2147 Beecher by plaintiff's counsel, meaning that it is very hard for the reader--and it seemed hard for the participants in the deposition--to follow the description of the deponent as to what unit of the house was being described at various points in the testimony.  Thus, there will be references frequently to "upstairs," with neither counsel nor the deponent seeming to understand which upstairs the other was referring to; the same with "downstairs;" where the various doors are located; and utter confusion, at least by this reader, as to what part of the house the deponents are referring when they speak of going uphill or downhill to a particular door or unit.

Given these challenges, the Court endeavors to set out, more particularly, the facts.

---

[3]  Plaintiff brought suit on the eve of the expiration of the statute of limitations, in November 2009.

5

II.   <u>FACTS</u>

During the relevant time period, plaintiff Ponder, suspect Demone Heyward, and another man lived at 2147 Beecher Road in Atlanta, Georgia ("the residence" or "2147 Beecher"). (Compl. [2] at ¶ 5.)  This residence was subdivided into three separate sections. (*Id.*)  Plaintiff occupied Unit A, an area located on the upper level of one side of the residence.  (Defs.' Br. in Support of Mot. Summ. J. ("Defs. Br.") [39] at 3.)  An "older" gentleman occupied the lower level of Unit A.  (*Id.*)  Heyward occupied Unit B, an area on the other side of the residence that was separated from Unit A by an interior and impassable brick wall.  (*Id.* at 3-4.)

A.    <u>Plaintiff Ponder's Version Of Events</u>

Prior to the events at issue in this case, in early November of 2007, two unidentified officers of the Fulton County Sheriff's Office attempted to execute an arrest warrant for parole violator Heyward at the residence at 2147 Beecher.  (Defs.'Statement of Material Facts ("DSMF") [39] at ¶ 13 and Arrest Warrant, attached to Pl.'s Partial Mot. for Summ. J. ("PMSJ") [38] at 8-9.)  The officers apparently went to the front door of the residence, which is an entry way for the upstairs Unit A, as they were greeted by plaintiff, who allowed them to search his home.  (DSMF [39] at ¶ 13.)  He also advised the officers that there was a tenant next door.  (*Id.*)  It is not clear whether the officers looked for Heyward next door after they left

6

plaintiff's unit. At any rate, they were apparently unable to find Heyward at that time, as the warrant remained outstanding.

About three weeks later, between the late evening of November 27th and early morning of November 28th, officers of the Fulton County Sheriff's Office again attempted to execute this arrest warrant for Heyward at 2147 Beecher, which was the address listed for Heyward on the warrant. (Borders Report, attached to PMSJ [38] at Ex. 4.) There is no allegation that any of the officers involved in this effort were aware of, or had been a part of, the earlier attempt to arrest Heyward during the first visit to plaintiff's residence. (*See* Pl.'s Statement of Undisputed Material Facts, attached to PMSJ [38] at 3-4.)

It was the task of defendant Weaver, who had the arrest warrant and a photograph of Heyward, to make the arrest. Accordingly, he was one of the first officers (and likely was the first officer) to approach the house. (DSMF [39] at ¶¶ 33, 43.) The first deputy to encounter plaintiff--whom again the Court infers to be Weaver, albeit it could have been his partner--knocked on the front door and asked if he could speak with "such and such," (presumably, Heyward). (Ponder Dep. [43] at 38.) Plaintiff could not open his front door because the knob was jammed, so he responded through the open blinds, telling the officer that he had "the wrong place." (*Id.*)

7

Immediately thereafter, plaintiff heard this deputy call for backup. (*Id.* at 42.) Plaintiff then put on some clothes, after which he went toward the back of his house to call his brother, who owned the residence. (*Id.* at 38.) At some point shortly thereafter, plaintiff went to the back door, he says, to explain to the deputy why, given the jammed door knob, he couldn't let him in before. (*Id.* at 39-46.)

When he got to the back door and opened it, a second deputy, described as a "Spanish guy," was standing there. (*Id.* at 44.) Weaver's partner was Deputy Bosco. (Weaver Dep. [48] at 10.) The deputy asked why plaintiff hadn't opened the front door, before; this deputy had a taser gun drawn. (*Id.* at 38.) Plaintiff told them that they had been there before, that they had the wrong place, and that they should go away. (*Id.* and PMSJ [38] at 7.) Even though plaintiff told the two deputies not to come in, one of them "barged in." Plaintiff reiterated that he was not giving the deputies permission to enter, but enter they did, and "[the two deputies] pretty much took over the house." (*Id.*) At some point in all of this, plaintiff heard other police cars arriving. (*Id.* at 40.)

Once the two deputies had entered plaintiff's unit, they handcuffed him and had him sit in his sunroom, which is toward the back of the house. (*Id.* at 47.) Plaintiff kept saying that they had the wrong person and wrong place, but they "weren't paying

8

attention." (*Id.* at 49.)  The Spanish deputy told plaintiff to "hold tight," and that when they had finished, they would let plaintiff go. (*Id.* at 50.)  Someone, presumably the two deputies, then searched Unit A, albeit plaintiff later says that 12 deputies came through his unit at some undescribed point during the evening.  (PMSJ [38] at 55.)

Plaintiff indicates that as the deputies were leaving, the supervisor ("the boss, the chief, or the colonel"), later identified as defendant Lieutenant Borders, said to do a background check on the plaintiff, even though the latter notes that, by then, the officers would have known that they had the wrong man.  One of the officers ran a check to see if plaintiff had any outstanding warrant and, apparently determining that he did not, an officer released the handcuffs on plaintiff and left.  (*Id.* at 55-58.)

### B.  **Other Officers' Accounts**

#### 1.  Sergeant Weaver

It is difficult to arrive at a consistent chronology or placement of Sergeant Weaver based on his deposition.  He indicates at one point in his deposition that he was not the officer who knocked on Ponder's door and who was refused entry.  (Weaver Dep. [48] at 7.)  But that testimony does not make sense, inasmuch as he and his partner, Deputy Bosco, were the first on the scene, and it was only when he learned from his partner that plaintiff or someone

9

was trying to escape or avoid letting him in that he called for back-up.[4]    Weaver admits that, at the time Heyward was arrested, Weaver was sitting in the kitchen with a subject who had been handcuffed and that he stayed with this subject until he learned that Heyward had been arrested; either he or his partner, Deputy Bosco, handcuffed this person.  (*Id.* at 12-14.)  This individual was handcuffed behind his back because he became a suspect when he came out the back side of the house.  (*Id.* at 24.)  This description would have to be of plaintiff.

###### 2.    Lieutenant Steve Border

Lt. Borders was the evening shift watch commander, who went to 2147 Beecher when he got a call that assistance was needed.  (Borders Mem. to File [38-1] at 4.)  According to his memorandum, Borders first encountered a group of officers who were standing outside one doorway, with a black male who said, "Ya'll can search all you want. Ain't nobody here but me."  (*Id.* at 5.)  Presumably, this was the "older" gentleman who lived in the lower part of Unit A, below the plaintiff.

---

[4]    Weaver also seems to confuse plaintiff with the three black males in Heyward's unit, as he says it was the three black males who would not open the door and who were talking through the blinds. (*Id.* at 8-9 (he could see three black males through front door.)) Yet, it is plaintiff who lives in the unit with a front door.

10

Then, Borders proceeded to another door at the end of the residence. This was the unit in which three black males were sitting and in which Heyward was ultimately found hiding in a dryer. Borders indicates that he entered this unit along with Deputies Levo, Cherry, and Weaver. (*Id.*) Ultimately, through some very perceptive police work, Borders found Heyward hiding in the dryer. (*Id.* at 5-6.)

In his deposition testimony, Borders indicates that he thought that plaintiff had consented to a search. He agreed that he could not say that plaintiff had consented to be handcuffed. (Borders Dep. [46] at 6.)[5] He further repeats that he encountered a black male who said they could search--this was presumably the "older" gentleman in the lower part of Unit A--and that some deputies did search but, within a minute or two, were satisfied that the individual they were seeking was not in this area of the house. (*Id.* at 16.) It is not clear from this testimony whether Borders meant that the deputies searched both the lower and upper levels of Unit A, or just the lower. Finally, Borders does not believe he was the person who

---

[5]    In his deposition, Borders also answers "yes" to a leading question concerning whether he participated in a search of plaintiff's unit. (*Id.* at 6.)  This does not seem accurate as Border's report does not reflect this fact and Borders was pretty busy pulling Heyward out of the dryer. Later, Borders corrects this testimony and indicates that he had not searched plaintiff's apartment, but had searched only Heyward's unit. (*Id.* at 20.)

11

directed Weaver to do a background check on plaintiff before un-
handcuffing him.  (*Id.* at 43.)

   3.   Deputy Marilyn Levo

   Deputy Levo arrived at the premises along with Deputy Cherry,
after they had heard the call for assistance.  (*Id.* at 6.)  She saw
three different doors along the back of the house.  She entered the
door in which the three black males were sitting.  (*Id.* at 7-8.)  One
of the other deputies was showing the males the photograph of Heyward
that Weaver would have originally possessed.  (*Id.* at 9.)  Levo
assisted Borders in the basement search of Unit B that led to the
discovery of Heyward.  (*Id.* at 10.)  The only time she saw Sergeant
Weaver was when she went to get him (presumably from upper Unit A)
after Heyward had been found in the dryer.  (Borders Dep. [46] at 7.)

   4.   Deputy James Redden

   Deputy Redden likewise responded to the call for assistance.  He
stayed upstairs in what would presumably have been Unit B, while
Borders and Levo searched for Heyward in the basement.  (*Id.* at 10-
11.)  Deputy Redden further testified that typically whomever was
holding the warrant would have had to explain to the ranking officer,
Lt. Borders, what was going on, once Borders arrived on the scene.
(*Id.* at 7, 13.)

   5.   Deputy Robert Price

   Deputy Price filed no answer and was not deposed.

12

## DISCUSSION

### I.   SUMMARY JUDGMENT STANDARD

The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The party seeking summary judgment bears the initial burden to show the district court, by reference to materials in the record, that there are no genuine issues of material fact that should be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If this initial burden is not satisfied, the motion must be denied and the court need not consider any showing made by the nonmovant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). If the movant satisfies this initial responsibility, the nonmoving party then bears the burden to show the existence of a genuine issue of material fact.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

Where the movant bears the burden of proof on an issue, the movant "must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick*, 2 F.3d at 1115.  Where the nonmovant bears the burden of proof, the moving party need only show the absence of evidence to support the nonmovant's case, or affirmative evidence demonstrating that the nonmovant will be unable

13

to prove their case at trial. *Id.* at 1115-1116. The court must view all evidence and draw all reasonable inferences in favor of the nonmoving party. *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).

There is no "genuine" issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The substantive law will determine which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## II.  OFFICIAL CAPACITY CLAIMS

Defendants move for summary judgment on any claims against them in their official capacity on the ground of sovereign immunity. (Defs.' Br. [39] at 8.) It is unclear from the complaint whether plaintiff intended to sue defendants in their official capacity. As plaintiff unequivocally states in his response that he is not seeking any liability against defendants in their official capacity (Pl.'s Resp. [53] at 1), this is now a moot point. *See Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1047 (11th Cir. 2008)("When it is not clear in which capacity the defendants are sued, the course of proceedings typically indicates the nature of the liability sought to be imposed."). As plaintiff has affirmatively disavowed any

14

official capacity claims, defendants' motion for summary judgment on
these claims is **GRANTED.**

### III.  CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS WHO PARTICIPATED IN SEARCH OF 2147 BEECHER ROAD

#### A.   Defendant Weaver

Only defendant Weaver raises the defense of qualified immunity.[6]
That is, Weaver does not deny that he was involved in the search of
plaintiff's upper Unit A nor has he denied that he was responsible
for handcuffing the plaintiff.  Similarly, he acknowledges that he
was the officer who released plaintiff, after it had been determined
that Heyward had been caught and after he then ran a check on
plaintiff to make sure there no active warrants.  He argues, however,
that he should receive qualified immunity for any liability that
might otherwise attach to this conduct.

Qualified immunity confers complete protection upon government
officials sued in their personal capacities unless their conduct
"'violate[s] clearly established statutory or constitutional rights
of which a reasonable person would have known.'"  *Vinyard v. Wilson*,
311 F.3d 1340, 1346 (11th Cir. 2002)(quoting *Harlow v. Fitzgerald*,
457 U.S. 800, 818 (1982)).  To receive qualified immunity, the
official must first demonstrate that he was acting within the scope

---

[6] As noted *infra*, defendant Levo mentions qualified immunity in
passing as to the claim against her.

AO 72A
(Rev.8/82)

of his discretionary authority when the alleged wrongful acts occurred. *Id.* The burden then shifts to plaintiff to show that defendant's conduct violated clearly established law. *Id.* A plaintiff meets this burden by establishing the violation of a constitutional right, and by showing that the right was so clearly established at the time of the alleged violation that a reasonable public official in a similar situation would be aware that his conduct was unconstitutional. *Id.* The law can be clearly established by decisions of the United States Supreme Court, the Eleventh Circuit, or the highest court of the state where the case arose. *Youmans v. Gagnon*, 626 F.3d 557, 565 (11th Cir. 2010).

Defendant Weaver does not dispute that he was acting in his discretionary authority in executing the arrest warrant. (Def.'s Br. [39] at 17.) He further concedes that at the time of the incident, it was clearly established that, "absent consent or exigent circumstances, a law enforcement officer could not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 159 Fed. App'x 916, 919 n.6 (11th Cir. 2005). *See also O'Rourke v. Hayes*, 378 F.3d 1201, 1208-1209 (11th Cir. 2004). Nevertheless, defendant Weaver argues that his actions did not violate plaintiff's constitutional rights.

16

1.   <u>Unreasonable Search And Seizure</u>

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. CONST. amend. IV. The invasion of a home without a search warrant is presumptively unreasonable. *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000). Furthermore, law enforcement is prohibited from using an arrest warrant as lawful authority to enter the home of a third party to conduct a search, in the absence of exigent circumstances, consent, or a search warrant for the third-party's home. *Steagald v. United States*, 451 U.S. 204, 205-206, 214 (1981). Nonetheless, the Supreme Court held in *Payton v. New York*, 445 U.S. 573, 603 (1980) that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Bervaldi*, 226 F.3d at 1263.

Although *Steagald* prohibits the warrantless entry of a third-party's residence to execute an arrest warrant, *Payton* allows such warrantless entry based upon an officer's reasonable belief that the suspect currently resides therein. *Id.* at 1267 n.11 (declining to apply *Steagald* because "the officers had a reasonable belief that the . . . residence was [the suspect's] residence, not some third party's residence as in *Steagald*, and that he was there at the time"). The

17

Tenth Circuit aptly described the dichotomy between *Steagald and*

*Payton* as follows:

> Whether *Steagald* (third-party's home) or *Payton* (suspect's home) applies is resolved under the first prong of the *Payton* test. If the officers reasonably believe the suspect lives at the residence, then *Payton* applies. The officers may enter on the authority of the arrest warrant, provided they reasonably believe the suspect is inside. They do not need a search warrant. If, however, the officers' belief that the suspect lives at the residence is not reasonable, then this implies the residence is a third-party residence. In that case, *Steagald* applies, i.e., the officers' arrest warrant is insufficient — they need a search warrant to enter.

*United States v. Thompson*, 402 Fed. App'x 378, 382 (10th Cir. 2010)(internal citation omitted).

Payton* requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment. *Berivaldi,* 226 F.3d at 1263. First, "there must be a reasonable belief that the location to be searched is the suspect's dwelling." *Id.* Assuming that requirement is met, the police must also have "'reason to believe' that the suspect is within the dwelling" at the time of entry. *Id.* (quoting *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995)). Under *Payton,* the Court must consider all of the facts and circumstances within the knowledge of the law enforcement agents at the time of the warrant's execution. *Id.* In conducting the *Payton* analysis, courts must remain sensitive to

18

common sense factors concerning the suspect's residence and presence. *Bervaldi*, 226 F.3d at 1263.

> 2.   Consent

Clearly, defendant Weaver violated *Steagald's* proscription against searching for a suspect in the home of a third-party without a search warrant for those premises.   As noted, two exceptions to this general rule apply: exigent circumstances and consent.   Weaver has not argued that exigent circumstances apply, but he does argue that he had consent to search plaintiff's premises.

A consensual search does not violate the Constitution, even in the absence of a warrant or probable cause.   *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).   Consent may be given by the individual whose property is searched, or by "a third party who possesses common authority over the premises."   *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).   Common authority is based on "mutual use of the property by persons generally having joint access or control for most purposes."   *Id.*   Whether consent to enter was given must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?"   *Id.* at 188 (citing *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

19

In support of his argument that he had consent to search upper Unit A,[7] Weaver notes that the occupant who lived in the lower level of Unit A permitted officers to enter this area and to search.[8] (Ponder Dep. [43] at 51-52 and Borders Dep. [46] at 16.) Weaver argues that, as the upper and lower levels of Unit A were accessible to one another through an interior stairs, a reasonable officer would have believed that the downstairs occupant had authority over the entire premises and that such a person had the power to consent to a search of the upper area, as well.

Were these the only facts in evidence, Weaver's argument would be persuasive, at least as to the entry of the upper part of Unit A. Yet, as noted *supra*, Weaver (or another deputy with Weaver) rang the front door bell of Unit A and was turned away by plaintiff. Then, according to plaintiff's testimony, when Weaver and his partner confronted plaintiff at the back door, he told them to leave and not

---

[7] Plaintiff points out that defendant Weaver explicitly denies entering plaintiff's unit on the basis of consent. (Weaver Dep. [48] at 21.) The Court reads that testimony as a denial that plaintiff had given consent, not a denial that the older male in the lower Unit A had consented. Nevertheless, the proper inquiry is an objective one, and defendant Weaver's subjective reasons for entering are irrelevant for the present analysis.

[8] This consenting individual would have been the older, black male who said, "Ya'll can search all you want. Ain't nobody here but me." (Borders Mem. to File [38-1 at 5].)

enter his area, but the officers ignored his request and entered the upper part of the unit, after which a search for Heyward occurred.

A "physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006)(holding that a tenant cannot consent to admit the police over a co-tenant's express objection). Thus, even though his supposed co-tenant had granted consent, the deputies were obliged to immediately terminate the search upon plaintiff's insistence that they do so; the deputies ignored plaintiff's request, and did not terminate the entry and search. Thus, even assuming that defendant Weaver reasonably believed that plaintiff and the downstairs occupant were co-tenants, rather than distinct lessees, Weaver's reliance on the downstairs tenant's consent was unreasonable, given plaintiff's objection. Furthermore, the law deeming this conduct to be unlawful was clearly established at the time the incident occurred.

In addition, although neither plaintiff nor defendant Weaver have addressed the significance of the handcuffing of plaintiff by Weaver and his partner, that event must be acknowledged as plaintiff claims not only an unlawful search of his property, but also an unlawful seizure of his person.[9] Even if Weaver had consent to enter

---

[9] This omission by defendant Weaver could be construed as a failure by him to seek qualified immunity for the seizure of

and search the upper part of Unit A, this did not automatically mean that Weaver had either reasonable suspicion or probable cause to handcuff the plaintiff and seize his person for the 45 minute-one hour period of time during which officers were searching for Heyward. Certainly, there can be circumstances during the execution of a search when an occupant of the property may need to be detained or subdued for the protection of the searching officers and others. Defendant Weaver has not identified what justification he had for doing so here, however.

For all the above reasons, Weaver violated the proscription of *Steagald* against the search for a suspect at the premises of a third-party, and none of the exceptions recognized by *Steagald* apply here.

### 3.   Reasonable Belief That Heyward Was In Unit A

Although defendant Weaver violated the law clearly established by *Steagald*, his conduct may still be excused if he satisfied the dictates of *Payton*. As noted above, *Payton* allows an officer, armed with an arrest warrant for a suspect, to make a warrantless entry of a residence for which the officer does not have a search warrant, if the officer has a reasonable belief that the suspect currently resides in that residence.

---

plaintiff's person.  If that is so, no matter the merits of the Court's analysis of the search question, the seizure claim remains uncontested by any summary judgment motion by defendant Weaver.

22

Defendant Weaver argues that he had a reasonable belief that Heyward lived at 2147 Beecher.  That assertion is correct.  He also argues that he had a reasonable belief that the residence was not a multi-occupant residency, and therefore he could not be expected to know, when he entered plaintiff's unit over the latter's objection, that, in fact, multiple renters lived at the property.

The undisputed evidence indicates that, at least at the time Weaver first approached the residence from the street, he was not on reasonable notice that the residence had multiple units. Specifically, the house had one mailbox and one front door.  Further, it was dark and the home was not illuminated.

Unfortunately for Weaver, the totality of the facts, when taken in the light most favorable to plaintiff, permit an inference that prior to searching plaintiff's unit, Weaver should have been on notice that there were multiple residences within the single home. First, although the chronology is very confusing, there is evidence to support an inference that Weaver had seen enough, prior to entering plaintiff's unit, to put him on notice that this was a multi-residence home.  In his own testimony, Weaver suggests that, prior to entering plaintiff's unit, he had looked through a glass window and seen the unit in which the three black males were seated. (Weaver Dep. [48] at 7-11.)  (*See also id*. at 22 (once Weaver saw

AO 72A
(Rev.8/82)

Ponder, he never again saw the three black males), which suggests that Weaver saw these males in their separate unit first.)

The main entry to plaintiff's unit was the front door to the residence.  There was clearly a separate entry to the unit in which the three black males were seated, and this entry was either on the side or the back of the house.

Further, while the observations and inferences of other officers are not dispositive, as Weaver may not have made the same route around the house as did these officers, it is worth noting that other officers on the scene had, at some point that evening, deduced that this was a multi-occupant dwelling.  (See Levo Dep. [49] at 11-14 (when she walked around the house in a route that plaintiff contends Weaver would have taken, she saw two different doors in back and realized that there were two different units); File Mem. of Lt. Borders [38-1] at 4-5 (Borders entered the doorway of the person who was presumably the older man who consented to a search; a couple of minutes later, the deputies were satisfied that Heyward was not in this area of the house; then Borders proceeded to another doorway at the top of the walkway where the three black males were located; Borders, Levo, Cherry and <u>Sgt. Weaver</u> entered this portion of the residence together.)

As to the law governing this type of situation, an officer is not liable where he mistakenly thinks there was only one apartment in

24

a particular building, but it turns out there was more than one and that the officer had searched that wrong apartment. *Maryland v. Garrison*, 480 U.S. 79, 88-89 (1987). Here, confusing though it may be, the evidence, taken in the light most favorable to plaintiff, permits an inference that defendant Weaver would have observed the separate entrances to the residence, would have seen three males in one of those separate units, and therefore would have known that the residence consisted of separate units, creating the possibility that he was about to search a unit in which the suspect did not reside, which is what, in fact, Weaver did as to plaintiff Ponder.

Accordingly, Weaver is unable to rely on the exemptions provided by *Payton*: that there is "a reasonable belief that the location to be searched is the suspect's dwelling" and that there is also "'reason to believe' that the suspect is within the dwelling" at the time of entry. *United States v. Magluta*, 44 F.3d 1530, 1533 (11th Cir. 1995).

Because defendant Weaver did not have a reasonable belief that Unit A was the suspect's dwelling, he fails to meet the first prong of the *Payton* standard. Thus, *Steagald* applies and defendant violated clearly established law by entering the residence without a warrant, exigent circumstances, or consent. *See O'Rourke*, 378 F.3d at 1210 (denying qualified immunity under *Steagald*).

25

For the above reasons, the Court **DENIES** defendant Weaver's Motion for Summary Judgment [39]. Given the muddled facts here, the Court also **DENIES**, for the present time, a broad grant of summary judgment for plaintiff as to this defendant. Should there be a trial, the Court and parties will confer to determine which components of this claim can be deemed to have been proven as a matter of law by the plaintiff and which have not. Accordingly, plaintiff's Motion for Summary Judgment [38] is **DENIED** as to this defendant.

### B.   Defendant Borders

Defendant Borders argues that the undisputed facts compel an inference that he never entered plaintiff's home, and thus never "searched" his home or "seized" his person in violation of the Fourth Amendment. (Defs.' Br. [39] at 13-15.) It is true that plaintiff was unable to identify all of the officers and individuals who entered his home on the evening in question. Nevertheless, taking the evidence in the light most favorable to the plaintiff, the Court concludes that there is evidence that Borders was involved in activity that a jury could conclude to have violated plaintiff's Fourth Amendment rights.

Albeit defendant Borders affirmatively states that he never searched any other place than where Heyward was found, which was Unit B. (Borders Dep. [46] at 21), he does admit that he entered the

26

apartment where plaintiff lives, the upper level of Unit A. (*Id.* at 20.)  Further, plaintiff has testified that the "chief," whom the evidence indicates would have been Lt. Borders, entered his premises toward the end of the encounter and directed Weaver, before letting plaintiff go, to do a "background" check on plaintiff to ensure that he had not active warrants.  To do this, Weaver went into plaintiff's pocket and got out his driver's license.  (Weaver Dep. [48] at 55-57.)

This directive came at a time when Lt. Borders knew, for a certainty, that plaintiff was not the suspect and knew that, by being present in plaintiff's unit, the officers were in a place where the suspect did not reside.  Indeed, by this time, Lt. Borders would have been certain that the residence was a multi-occupant unit, as he had seen the various units during the course of the effort to find Heyward.  Further, testimony indicates that, as the ranking officer, Borders would have spoken to the officer holding the warrant, Weaver, immediately upon arriving on the scene.

Accordingly, defendants Borders' Motion for Summary Judgment [39] is **DENIED**.[10]  Yet, as Borders disputes some of plaintiff's factual allegations, a jury must decide the matter of Borders'

---

[10]  It should be noted that defendant Borders has not sought qualified immunity, but instead has sought summary judgment only on the ground that he never entered plaintiff's unit nor searched plaintiff.

27

conduct and liability.  Accordingly, plaintiff's Motion for Summary Judgment [38] is **DENIED** as to this defendant.

   **C.   Defendants Redden And Levo**

   Defendants Redden and Levo argue that the undisputed facts compel an inference that defendants never entered plaintiff's home, and thus never "searched" his home or "seized" his person in violation of the Fourth Amendment.  (Defs.' Br. [39] at 13-15.) Plaintiff was unable to identify all of the officers and individuals who entered his home, although he estimates that a dozen or so entered his residence at some point in the evening.  (Ponder Dep. [43] at 48-49.)

   As to Redden, the Court has culled the record and can find nothing in that record that reasonably suggests that Redden ever entered or searched the upper Unit A, occupied by plaintiff.  As to defendant Levo, she concedes that she entered plaintiff's unit momentarily after Heyward had been apprehended, and then only to advise Weaver that the other officers had caught Heyward and that Weaver could exit the scene.  (Defs.' Br. [39] at 15.; Borders Dep. [46] at 25.)

   Nonetheless, the Court concludes that Levo should not be held liable for violating plaintiff's constitutional rights based on this isolated entry.  As a practical matter, plaintiff had already been handcuffed for 45 minutes and his unit had already been searched by

28

the time Levo arrived.  If anything, Levo helped to mitigate the situation by informing Weaver that the suspect had been apprehended and he could leave.  This disclosure meant that plaintiff was then able to be freed from his handcuffs, which was a good development for him.

Moreover, the actions of both Redden and Levo were taken at the behest of their superior officer, Lt. Borders, that evening and the entire chain of events was initiated by Sgt. Weaver.  *See Shepard v. Hallandale Beach Police Dep't*, 398 Fed. App'x 480, 483-84 (11th Cir. 2010)(assisting officers in illegal search are entitled to qualified immunity when they followed the lead of a primary officer, as they did not act unreasonably nor should they have known that they were violating anyone's Fourth Amendment rights; this is so even thought the primary officer was denied qualified immunity); *Hartsfield v. Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995)(although officer who initiated an unreasonable, albeit mistaken, search of a premises was held liable for this illegal search of the wrong premises, those officers who accompanied the initiating officers and following his lead did not act unreasonably nor should they have known that their conduct might result in a violation of the plaintiffs' Fourth Amendment rights); *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001)(customs inspectors who participated in a search that was later ruled unconstitutional were entitled to qualified immunity, as they

29

acted at the order of a superior and there was no reason why they should have questioned the validity of that order).

Accordingly, defendants Redden and Levo's Motion for Summary Judgment [39] is **GRANTED** and plaintiff's Motion for Summary Judgment [38] is **DENIED** as to these defendants.

**D.   Defendant Price**

Defendant Price did not file an answer or respond to plaintiff's partial motion for summary judgment [38]. He failed to respond despite being given notice by the Clerk of Court of his obligation to do so. (Notice [50].) This means that, not only is defendant Price subject to default, but plaintiff's statement of material facts is admitted against him. FED. R. CIV. P. 55 and LR 56.1(B)(2)(a)(2), NDGa.

Nevertheless, the Court is required to review plaintiff's citations to the record to see if a genuine issue of fact remains. Even in an unopposed motion, the moving party still bears the burden of identifying the evidence "which it believes demonstrates the absence of a genuine issue of material fact." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). Plaintiff is not "absolve[d]. . . of the burden of showing that [he] is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise

30

unsupported in the record." *Id.* (citing *Reese v. Herbert*, 527 F.3d 1253, 1268-69 (11th Cir. 2008)).

Plaintiff asserts in his statement of facts that "Mr. Price was also in Plaintiff's residence, Unit A." (PSMF [38] at ¶ 21.)   In support of this statement of fact, plaintiff relies on the deposition testimony of defendant Weaver.   In his deposition, Weaver recalls defendant Price going through the area of plaintiff's residence where plaintiff was being detained.   (Weaver Dep. [48] at 17.)

Nevertheless, again given the muddled and confusing facts in the case and what appears to be very peripheral involvement on Redden's part, the Court declines at this time to grant a motion for summary judgment for plaintiff, to the extent he was seeking to make one as to Price.   Should there be a trial, the Court and counsel will determine how the case should proceed as to Price.   Plaintiff's Partial Motion for Summary Judgment [38] as to defendant Price is therefore **DENIED WITHOUT PREJUDICE**.

### E.   Defendants Freeman And Applin

Finally, defendants move for summary judgment on plaintiff's claims against defendants Freeman and Applin.   Defendant Freeman was the Sheriff of Fulton County in November, 2007.   (DSMF [39] at ¶ 20.) Defendant Applin was a Captain and the division commander over the warrant services division at the same time.   (*Id.* at ¶ 23.) Plaintiff argues that defendant Freeman should be held liable for the

31

failure to supervise and train the sheriff's deputies who allegedly violated his constitutional rights. (Pl.'s Resp. Br. [53] at 1-5.) Defendant Applin is only alleged to have improperly supervised his deputies. (*Id.* at 5-9.)

      1.   <u>Supervisory Liability</u>

      Supervisory officials cannot be held liable under § 1983 on the basis of respondeat superior or vicarious liability. However, a supervisor may be held liable when either "(1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." *Mann*, 588 F.3d at 1308. It follows that a prerequisite to any derivative liability is the existence of a constitutional violation. *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008). As explained above, the Court has found that, taking the facts in the light most favorable to the plaintiff, a jury could conclude that defendants Weaver and Borders violated plaintiff's Fourth Amendment right to be free from an unreasonable search and seizure.

      Turning to supervisory liability, it is undisputed that defendants Freeman and Applin did not personally participate in the execution of the arrest warrant. (DSMF [39] at ¶ 27.) Defendant Freeman's alleged supervisory liability must then turn on whether there is a causal connection between his conduct and the alleged

32

wrongful search and seizure.  The requisite causal connection may be established "'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so,'" or when the supervisor's "improper 'custom or policy . . . resulted in deliberate indifference to constitutional rights.'" *Gonzalez v. Reno*, 325 F.3d 1228, 1234-35 (11th Cir. 2003)(quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)).  A causal connection can also be established by "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003).

Plaintiff has not made an adequate showing in responding to summary judgment that defendants Freeman or Applin were on notice of a "history of widespread abuse" requiring a need to correct the alleged deprivation.  Plaintiff identifies no prior instances where members of the Fulton County Sheriff's Office executed arrest warrants in homes of third parties without any reason to believe the suspect resided in the home.  *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)("deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.") and *Williams v. Santana*, 340 Fed. App'x 614, 618 (11th

33

Cir. 2009)(allowing a supervisory liability claim where the supervisor was aware of eight prior incidents involving a subordinate's misconduct). While it was a common occurrence for deputies to be unable to serve their arrest warrants because individuals were not at home at the time the warrant was executed, the record does not disclose that these attempts to serve violated any constitutional right. (Applin Dep. [44] at 22.)

There is also no evidence in the record that would support an inference that these defendants directed their subordinates to act unlawfully, or knew that they were acting unlawfully and failed to stop them from doing so. *See Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010)(allowing a claim for supervisory liability where plaintiffs alleged that the sheriff approved orders permitting violent dispersal of lawfully assembled protestors). To the contrary, defendant Freeman appears to lack any knowledge whatsoever about the execution of warrants in his jurisdiction. Defendant Applin did not participate in the execution of the warrant at the residence, and was not aware, prior to that time, that the residence was subdivided. His lack of involvement in the search, while not dispositive to a claim for supervisory liability, offers little basis to conclude that he directed deputies to act unlawfully. *Baskin v. Parker*, 602 F.2d 1205, 1208 (5th Cir. 1979)(explaining that a sheriff may be personally liable under § 1983 for a search carried out under

34

an illegally obtained warrant if he participated in obtaining the warrant and organizing the search).

The only potential basis for liability against defendants Freeman and Applin must then rest on the existence of a policy or custom that is deliberately indifferent to the Fourth Amendment right to be free from unreasonable searches and seizures during the execution of an arrest warrant. Plaintiff contends that defendant Freeman failed to institute a policy that would have alerted the officers to the fact that an attempt had already been made to serve an arrest warrant. (Compl. [2] at ¶ 7.) Had he done so, plaintiff argues, the defendants in this case would have known about the earlier encounter at 2147 Beecher, would have known that the residence was a multi-family dwelling, and would not have entered plaintiff's unit based only on the arrest warrant for Heyward.

Contrary to plaintiff's assertion, the evidence shows that, at the time of the incident, the Sheriff's Office had a policy aimed at tracking the status of arrest warrants. (DSMF [39] at ¶ 24.) Specifically, the Sheriff's Office used an electronic system to record whether an attempt to serve an arrest warrant has been made. (*Id.*) A "cover sheet" is attached to the warrant which allows officers to note and review prior attempts at service. (*Id.*) The system keeps track of what happens when attempts are made on a warrant. (*Id.* at ¶ 25.)

AO 72A
(Rev.8/82)

Plaintiff disputes the existence of the tracking system.  He points to defendant Weaver's testimony, where he describes picking up a warrant that only bore a name and address, and lacked any other information regarding prior attempts to serve.  (Weaver Dep. [48] at 6.)  He also points to defendant Applin's testimony to suggest that the system was not implemented because Applin says that "they should have scanned the document out."  (Applin Dep. [44] at 10-11.)  Neither defendant Weaver nor defendant Applin's testimony undercuts the fact that a tracking system was in place.  Whether the warrant information was particularly recorded in this case is an open debate, but there is no dispute that a tracking system existed.

Further, the fact that the unidentified officers involved in the first encounter in early November at the residence may have failed to execute the above policy does not mean there was an unconstitutional policy sufficient to impose supervisory liability. *West v. Tillman*, 496 F.3d 1321, 1330-31 (11th Cir. 2007)("Evidence that the [j]ail staff occasionally erred and failed to fulfill their duties as instructed is insufficient to satisfy the high standard for supervisory liability.").  As such, this is not a case where a sheriff created an affirmatively unconstitutional policy. *See Wanger*, 621 F.2d at 683 (permitting the jury to consider the sheriff's liability where he promulgated a policy of searching the premises whenever the person to be arrested could not be found).

36

As defendants Freeman and Applin did not promulgate a policy that was deliberately indifferent to the rights of those citizens who come into contact with deputies attempting to execute arrest warrants. Their Motion for Summary Judgment as to supervisory liability is **GRANTED**.

   2.   Failure to Train

Plaintiff also claims that defendant Freeman failed to adequately train his deputies, which in turn led to a violation of plaintiff's rights. In order to prevail on a failure to train claim, a plaintiff must establish that the supervisor has a policy of failing to adequately train or supervise employees and that this policy caused the employees to violate the plaintiff's constitutional rights. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)(failure to train in a municipal liability context). The failure to train must amount to deliberate indifference of the rights of citizens with whom the supervisor's employees come into contact. *Id.* at 1350. A failure to train amounts to deliberate indifference when "the need for more or different training is obvious, such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures, and when the failure to train is likely to result in the violation of a constitutional right." *Belcher v. City of Foley*, 30 F.3d 1390, 1397-98 (11th Cir. 1994)(internal citations omitted).

37

This theory of liability must fail for the same reason as the supervisory liability claim.   Plaintiff presents no evidence to suggest that defendant Freeman was, or should have been, aware of the need for training.   *See Gold*, 151 F.3d at 1351-52 (rejecting supervisory liability for failure to train when no pattern of incidents put defendant on notice of a need to train).   Moreover, it is undisputed that the Sheriff's Office's policy requires an officer to discontinue a search if a unit they are searching is subdivided into sub-units.   (DSMF [39] at ¶ 28.)   The existence of this policy, and Applin's knowledge of it, demonstrates some level of training as to appropriate warrant execution practices.   Accordingly, defendant Freeman is not liable for any alleged failure to train and his motion for summary judgment should be **GRANTED**.   *Compare Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007)(remanding on failure to train issue where multiple officers testified that no training was offered as to propriety or scope of administrative inspections).

<u>CONCLUSION</u>

For the foregoing reasons, defendants Weaver and Borders's Motion for Summary Judgment [39] is **DENIED**; defendants Levo and Redden's Motion [39] is **GRANTED**; and defendants Freeman and Applin's Motion for Summary Judgment is **GRANTED** [39].   Plaintiff's Motion for Partial Summary Judgment [38] is **DENIED without prejudice**.

38

SO ORDERED, this <u>29th</u> day of MARCH, 2013.

<u>/s/ Julie E. Carnes</u>
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)